## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

**KENNETH B. WILLS,**

      **Plaintiff,**

**vs.**                               **Case No. 4:05cv381-WS/WCS**

**JOHN E. POTTER,**
**POSTMASTER GENERAL,**

      **Defendant.**

_____/

## REPORT AND RECOMMENDATION

Pending in this case is Defendant's motion for summary judgment.  Doc. 60.

Plaintiff, who is *pro se* in this Title VII case, was advised of his burden in opposing

summary judgment.  Doc. 61.  Plaintiff's opposition to Defendant's summary judgment

motion was filed on October 12, 2007.  Doc. 68.

Thereafter, Plaintiff filed his own motion for partial summary judgment as to one

claim, "negligent retention of Willie Hightower as a supervisor over Plaintiff," doc. 62,

and then a revised motion for partial summary judgment as to this same claim.  Doc. 70.

Defendant filed a response to Plaintiff's motion on October 5, 2007, doc. 65, and

thereafter, filed a supplemental response, doc. 69.  Plaintiff was given leave to

supplement his motion for partial summary judgment, doc. 67, and he did so on October 17, 2007.  Doc. 70.

**Allegations of the Second Amended Complaint, doc. 56**

Plaintiff alleged that he had been employed by Defendant, the United States Postal Service, Office in Tallahassee, Florida, from October of 1988 through April 15, 2005.  Doc. 56, p. 3.  He alleges claims arising under Title VII and the Americans with Disabilities Act (ADA).  *Id.*, p. 4.  Plaintiff alleges discrimination due to his race (African-American) and disability (mental, emotional).  *Id.*, p. 3.  As acts of discrimination, Plaintiff alleges failure to accommodate his disability, harassment, abuse, retaliation, termination, and negligent retention of his supervisor.  *Id.*

Plaintiff alleged harassment by a supervisor, Willie Hightower, on May 5, 1995, and July 30, 1995.  *Id.*, at 4.

Plaintiff alleged that he was suspended for unauthorized absences in August ,2003, even though Ms. Dickens knew Plaintiff had been approved for leave under the Family and Medical Leave Act (FMLA).  *Id.*, p. 5.

Plaintiff claimed he was denied forklift training and overtime.  *Id.*, at 5.  He further alleged that supervisors knew of his disability but did nothing to help him.  *Id.*

Plaintiff also alleged he was directed to work on two machines at once by the acting supervisor and then, when Plaintiff complained by filing an EEO complaint, the acting supervisor retaliated against him.  *Id.*, at 6.

Plaintiff alleged that there was a conspiracy to terminate him in retaliation for his complaints.  *Id.*

He further alleged he was "not given preference in line with [his] seniority on overtime, holidays off or promotion." *Id.*

Finally, Plaintiff alleged state law claims of intentional and negligent infliction of emotional distress. *Id.*, p. 8.

**Defendant's Arguments**

Defendant contends there is no evidence to show that Plaintiff is "disabled" under the Act or that Plaintiff ever requested an accommodation for a disability. Doc. 60. Further, Defendant asserts that Plaintiff will be unable to demonstrate a *prima facie* case of discrimination and, moreover, there were "compelling legitimate non-discriminatory business reasons for each of the actions taken." *Id.* Defendant contends some of Plaintiff's claims must be dismissed because he "failed to exhaust administrative remedies." *Id.*

**Legal standards governing a motion for summary judgment**

On a motion for summary judgment Defendant initially has the burden to demonstrate an absence of evidence to support the nonmoving party's case. Celotex Corporation v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 2553-54, 91 L. Ed. 2d 265 (1986). If accomplished, the burden shifts to Plaintiff to come forward with evidentiary material demonstrating a genuine issue of material fact for trial. *Id.* An issue of fact is "material" if it could affect the outcome of the case. Hickson Corp. v. Northern Crossarm Co., Inc., 357 F.3d 1256, 1259 (11th Cir. 2004) (citations omitted). Plaintiff must show more than the existence of a "metaphysical doubt" regarding the material facts, Matsushita Electric Industrial Co., LTD. v. Zenith Radio Corporation, 475 U.S. 574, 586, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986), and a "scintilla" of

evidence is insufficient.  The court must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  <u>Hickson Corp.</u>, 357 F.3d at 1260, *quoting* <u>Anderson v. Liberty Lobby</u>, 477 U.S. 242, 252, 106 S. Ct. 2505, 2505, 91 L. Ed. 2d 202 (1986).  All reasonable inferences must be resolved in the light most favorable to the nonmoving party.  <u>Watkins v. Ford Motor Co.</u>, 190 F.3d 1213, 1216 (11th Cir. 1999).

"Rule 56(e) . . . requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' "  <u>Owen v. Wille</u>, 117 F.3d 1235, 1236 (11th Cir. 1997), *cert. denied* 522 U.S. 1126 (1998), *quoting* <u>Celotex</u>, 477 U.S. at 324, 106 S. Ct. at 2553 (quoting Fed. R. Civ. P. 56(c), (e)).  The nonmoving party need not produce evidence in a form that would be admissible as Rule 56(e) permits opposition to a summary judgment motion by any of the kinds of evidentiary materials listed in Rule 56(c).  <u>Owen v. Wille</u>, 117 F.3d at 1236; <u>Celotex</u>, 477 U.S. at 324, 106 S. Ct. at 2553.

Plaintiff may move for summary judgment, with or without supporting affidavits, upon all or any part of his or her claim.  Fed. R. Civ. P. 56(a).  Summary judgment shall be granted in favor of Plaintiff "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  "A claimant is entitled to summary judgment only when no genuine issue of material fact exists, the papers on the motion demonstrate the right to relief, and every one of the defenses asserted legally are insufficient."  10B

CHARLES A. WRIGHT, ARTHUR R. MILLER, & MARY K. KANE, FEDERAL PRACTICE AND PROCEDURE § 2734 (1983).  Since Plaintiff (as the party with the burden of proof) has a heavier burden on summary judgment, Defendants' motions for summary judgment will be considered first.

**The relevant Rule 56(e) evidence**

> **Defendant's evidence**

> > **Forklift training**

At all times relevant to Plaintiff's allegations, Plaintiff was employed as a Mail Processing Machine Operator.  Doc. 60, p. 2.  *See also* doc. 60-2 on the electronic case filing docket (ECF), p. 2 (ex. A).[1]

In March of 1995, Plaintiff was transferred and reassigned to Tallahassee as a part time, flexible position employee, as a mailhandler.  Doc. 60-30, pp. 1 and 3 (ex. CC); *see also* doc. 60-30, p. 3.  On April 3, 1995, Plaintiff was changed to a "fulltime mailhandler" position, filling "residual vacancy #6556682."  Doc. 60-30, p. 4 (ex. CC). The copy of that notice shows that Plaintiff's assignment, effective on April 15, 1995, as: "principal assignment area: Mark II, outgoing, and any other area the needs of the service may require."  Doc. 60-30, p. 5 (ex. CC).

Plaintiff's duties as a Mail Processing Machine Operator included the operation of two machines:  an Advanced Facer Canceller (an "AFC"), and a Micro Mark mail processing machine.  Doc. 60, p. 2; doc. 60-2, p. 3 (ex. A).  Plaintiff was one of three

---

[1] References are to the paper copy and page number, followed by a reference (in parenthesis) to the corresponding document and page in the electronic docket for documents on the electronic docket.  Both citations are referenced as a *pro se* litigant will not have ready access to the court's electronic docket.

such operators in his work unit.  Doc. 60, p. 2; doc. 60-4 (*see* exhibits A, B, and C).

Both of the other operators had more seniority than Plaintiff.  Doc. 60, p. 2; exhibits FF

and II.

Plaintiff had requested that he be trained to operate a forklift, but his request was

denied because those skills were not necessary for Plaintiff to perform his duties as a

mail processing machine operator "with a principal assignment" on the Mark II

cancellation machine.  Doc. 60, p. 2; doc. 60-3, p. 6 (ex. B); docs. 60-4 and 60-33 (exs.

C, FF).  In other words, Plaintiff's job was "a Mail Processing Machine Operator"

although it could generally be said that "Mailhandler" was the "craft he was assigned to."

Doc. 60-33, p. 1 (ex. FF).  Plaintiff was not a "relief tech," although during his first 30

days of employment, when he was "a Part Time Flexible 'PTF' Mailhandler," he might

have been needed and worked on the dock during that time.  *Id.,* at 1-2.  As a mail

processing machine operator, his full-time position, Plaintiff did not need forklift training

because he might have been assigned to break down mail, but would never have been

needed to operate a forklift as "other" duties assigned.  Doc. 60-31, p. 2 (ex. DD; see

also ex. FF, doc. 60-33, p. 2).  Neither of the other two Machine Operators in Plaintiff's

work unit with the same occupation code (Craig Clark and Kenneth Young) were

provided forklift training.  Doc. 60, p. 3; doc. 60-3, p. 6 (ex. B); doc. 60-33, p. 1 (ex. FF).

Some mailhandler jobs do require forklift training, and when that is so, "their bid awards

so specify if that is the case," but Plaintiff was not assigned to those jobs.  Doc. 60-33,

p. 1 (ex. FF).  There was simply "no reason to train" Plaintiff on the forklift since his

"duty assignment required him to . . . operate postal cancellation machines."  Doc. 60-6,

p. 1 (ex. E).  Plaintiff received a formal memorandum dated April 30, 2003, explaining

the basis for the repeated denials of his numerous requests for forklift training.  Doc. 60-30, p. 6 (ex. CC); doc. 60-32 (ex. EE).  The particularly relevant portions of that memorandum state:

> On April 30, 2003, you asked me what you had to do in order to get forklift training.  You said you needed forklift training to be able to unload the trucks when you worked overtime at Christmas.
>
> You have repeatedly asked me this same question since 1996.  My response will have to remain the same as always: It is true that in January 1996, you were started on the classroom portion of Powered Industrial Truck Training which includes forklift.  However, you never received on-the-job (practical) training and vehicle familiarization and certification in order to be considered a certified PIT operator.
>
> The reason that your training was stopped was because it was verified that since April 15, 1995 you have held job 6556682, Mail Processing Machine Operator.  Your principal assignment area is Mark II, outgoing, and any other area the needs of the service may require.  No where on your job description does it require forklift or Powered Industrial Truck operation.  PIT/forklift training was started in error by management and was stopped by management when they realized this training was not a requirement for your job and it was not required by the needs of the service.  Tallahassee does have mailhandlers jobs which require PIT equipment operation but your job 6556682 does not have that requirement.

Doc. 60-30, p. 6 (ex. CC).

Plaintiff alleged in his complaint four other persons who were provided forklift training:  Mr. Shiver, Mr. Jamison, Mr. Rawls, and Ms. Scurry.  Defendant has produced evidence showing that two of those four persons (Jamison and Scurry) had a different occupation code from Plaintiff and their positions required them to move mail around "on the workroom floor and/or dock."  Doc. 60-3, p. 6 (ex. B).  The other two persons (Shiver and Rawls) had an occupation code as a mail handler group leader which would also make them "responsible for moving the mail around on the floor and/or dock."  *Id.* The other Mark II operators who had the *same* occupation code as Plaintiff (234045XX)

were Craig Clark, a while male, and Kenneth Young, a black male.  Doc. 60-3, p. 6 (ex.

B); doc. 60-31, p. 2 (ex. DD); *see also* doc. 60-32 (ex. EE).  Neither of those employees

received forklift training either as they "would not have any need to operate a forklift."

Doc. 60-3, p. 6 (ex. B, p. 6); doc. 60-31, p. 2 (ex. DD); *see also* doc. 60-32, p. 1 (ex.

EE).  The decision to deny forklift training was the "consensus opinion of all Tour 3

supervisors."  Doc. 60-9, p. 2 (ex. H).

### Holiday work

Plaintiff was required to work on a holiday, Saturday, August 30, 2003, (because

Labor Day fell on a Monday), but another "junior employee," Connie Maciora, was not

required to do so.  Doc. 60, p. 3; docs. 60-4, 60-8, p. 4, doc. 60-10, p. 1 (exs. C, G, I).

Defendant explained that Ms. Maciora, who was a part-time flexible Mail Handler, had

already been pre-approved for annual leave during the holiday period and, thus, was

not required to work.  Doc. 60, p. 3; docs. 60-6, p. 2, 60-8, p. 4, 60-9, p. 1 (exs. E, G,

H).  Notably, Plaintiff had been "absent from work from approximately August 5,2003

until August 27, 2003."  Doc. 60-9, p. 1 (ex. H).  Ms. Maciora requested leave for August

30th on August 11, 2003, while Plaintiff was absent.  Doc. 60-9, p. 1 (ex. H).

Plaintiff was forced to work on August 30, 2003, because there were no other

volunteers to work overtime.  Doc. 60-6, p. 2; (ex. E).  An employee who was senior to

Plaintiff, Mr. Bagot, was also "on holiday" and because Plaintiff was junior to him,

Plaintiff was required to work even though he was not scheduled to work.  Doc. 60-8, p.

4 (ex. G).  Plaintiff was not the only employee required to work on the holiday, however,

as "Mail Handler Johnny Fillmore was also scheduled to work."  Doc. 60-8, p. 4 (ex. G).

To fulfil the duty to ensure the efficient delivery of mail, there will be "times when employees are required to work on their holiday."  Doc. 60-9, p. 1 (ex. H).

Plaintiff received "holiday pay" for working that day, "which is calculated at double his normal pay."  Doc. 60-9, p. 2 (ex. H).

### Denied Overtime

Plaintiff was *not* permitted to work overtime during September 15-18, 2003, although a "junior employee," Geneva Scurry, was allowed to work overtime.  Doc. 60, p. 3.  Ms. Scurry was a Mail Handler, not in Plaintiff's position as Machine Operator, and worked overtime to perform the duties of another Mail Handler who was ill.  Doc. 60, p. 3; docs. 60-4, p. 1, doc. 60-8, p. 5 (exs. C, G).  Furthermore, Ms. Scurry was assigned to work overtime in accordance with the USPS National Contract.  Doc. 60, p. 4; doc. 60-3, p. 7 (ex. B).  That contract provides, among other things, that requirements if a qualified full-time employee is not on the overtime desired list or the volunteer lists for overtime, overtime "shall be on a rotating basis with the first opportunity assigned to the junior employee."  Doc. 60-3, p. 7 (ex. B) (emphasis in the original).[2]  Neither Plaintiff nor Scurry signed the overtime desired list.  *Id.*, p. 6.  Ms. Scurry was the junior employee and, moreover, Plaintiff's request for overtime came prior to his regular reporting time and his services were not needed at that time.  Doc. 60, p. 4; docs. 60-3, p. 7, 60-8, p. 5, and 60-9, p. 2 (exs. B, G, and H).  This occurred because Plaintiff did not report to work until 4:00 p.m., and no overtime was need *prior* to 4:00 p.m.; Ms.

---

[2] That contract also provide states that "overtime work shall be scheduled among qualified full time regular employees doing similar work in the work location where the employees regularly work . . . ."  Doc. 60-3, p. 7 (ex. B).  Furthermore, full time employees are required to sign an "overtime desired" list.  *Id.*

Scurry was scheduled to work at 6:00 p.m., and she was asked to work two hours of overtime beginning at 4:00 p.m.  Doc. 60-9, p. 2 (ex. H).

It is represented that another Machine Operator with more seniority than Plaintiff, Kenny Young, was assigned to work overtime as a Machine Operator instead of Plaintiff.  Doc. 60, p. 4.  Mr. Young, however, had volunteered in advance by signing the overtime desire list, but Plaintiff did not sign that list.  Doc. 60, p. 4; doc. 60-3, p. 64 (ex. B).

### FMLA and leave time restrictions

During the relevant periods as alleged by Plaintiff, there were only two other employees who could be considered "similarly situated" to Plaintiff, that is, who have the "same job description, the same supervisor, and same pay grade."  Doc. 60-3, p. 8 (ex. B).  Those persons were Mr. Craig Clark (a Caucasian male) and Mr. Kenneth Young (an African-American male); neither "Mr. Clark nor Mr. Young were on restricted sick leave."  Doc. 60-3, p. 8 (ex. B).  Plaintiff was placed on a restricted sick leave status pursuant to Section 513.37 of the Employee and Labor Relations Manual because of irregular attendance.  Doc. 60, p. 4; docs. 60-3, pp. 4, 28, 60-9, p. 3 (exs. B, H).  Plaintiff was issued a letter signed by his supervisor and dated July 23, 2003, which required him to comply with strict reporting requirements for future absences.  Doc. 60, p. 4; doc. 60-3, p. 28 (ex. B).

Defendants have presented evidence that if an employee had an absence that could potentially be covered under the FMLA, a message was left by the employee's attendance supervisor on the FMLA coordinator's log, which would then prompt a check on the enterprise Resource Management System (hereinafter "eRMS") to determine

whether the employee met the first qualification (having worked 1,250 hours in the prior

year).  Doc. 60-3, 60-3, p. 2 (ex. B).  If so, a "New Call" letter would be sent to the

employee explaining the qualifying condition under the FMLA and giving the employee a

form WH380 to take to his health care provider.  Doc. 60-3, p. 2 (ex. B).  The letter

would direct the employee to respond within 15 days from receipt of the "New Call"

letter, and advise that he could request, if there was good reason to do so, an extension

of time to turn in the paperwork.  Doc. 60-3, p. 2 (ex. B).

> For an absence to be covered by FMLA, [an employee] must have been
> employed by the Postal Service for a total of at least 1 year and must have
> worked a minimum of 1,250 hours during the 12-month period before the
> date [the] absence begins.  Once eligible for a given condition, if [the
> employee's] work hours subsequently fall below 1,250 during the postal
> leave you, [the employee's] eligibility for FMLA protected absences for that
> condition remains in effect for the duration of the leave year.  However, if a
> second and unrelated condition arises in the leave year, [the employee]
> must meet the 1,250 eligibility test anew in order to obtain FMLA protected
> leave for that (i.e., second) reason.

Doc. 60-3, p. 10 (ex. B).

On August 11, 2003, a "New Call" letter was sent by Ruth Busey to Plaintiff, and

received by him, on that same day.  Doc. 60-3, p. 2 (ex. B).  Plaintiff should have

responded with the needed paperwork by August 26, 2003.  *Id.*  Due to the length and

cause of Plaintiff's absence, Plaintiff had to return a medical certification and clearance

form before he could report back on work.  Doc. 60-3, p. 3.  On August 21, 2003,

Plaintiff's physician stated that Plaintiff "could return to work on 8/26/03."  *Id.*  However,

Ms. Busey's affidavit explains that Plaintiff still was not qualified for FMLA protection at

that time because the WH380 form had not been returned.  *Id.*

On September 4, 2003, the WH380 form was received by Ms. Busey, but she

said that the form was "incomplete and still did not qualify [Plaintiff] for FMLA

protection."  Doc. 60-3, p. 3.  Cited for this is a note from Ms. Busey that reasoned that the form was incomplete because the physician had not indicated the "frequency or duration" of the illness.  Doc. 60-3, p. 22.  The form, doc. 60-3, pp. 23-24, shows that the physician had indicated that the condition was chronic (checking box 4), but in response to question 5.c., asking for frequency and duration, said "depression may be lifelong or may resolve prior."  Doc. 60-3, p. 24.

The following day, Ms. Busey sent Plaintiff "a 'CURE' letter, also known as a 'Frequency & Duration' letter" and returned the WH380 form to Plaintiff.  Doc. 60, ex. B; ex. 60-3, p. 3.  The WH380 was received for the second time by Ms. Busey on September 16, 2003, and Ms. Busey indicates Plaintiff should have been approved for FMLA leave on September 16, 2003.  *Id.*  She further states in her affidavit that Plaintiff's request for FMLA should have been "disapproved . . . on August 26, 2003" because the proper form was not completed and returned until later.  *Id.*  Also, the returned form provided that Plaintiff could return to work on August 26, 2003, and that he was "out of work" from August 5th through August 25th.  Doc. 60-3, pp. 23-24.

Ms. Busey's affidavit indicates that "on several other occasions [Plaintiff] called in with an FMLA condition but never followed through and provided the paperwork."  Doc. 60, ex. B; ex. 60-3, p. 3.  "Therefore in those cases FMLA was denied."  *Id.*  As for this particular instance, Plaintiff would not have been approved for FMLA leave until September 16th, and was not approved during August of 2003.  *Id,* at 2-3.[3]  Defendant

---

[3] Ms. Busey explains in her affidavit that Plaintiff's completed WH380 was not provided until September 16, 2003.  Doc. 60-3, p. 3.  Until that document was received, Plaintiff would not have been qualified for protection under the FMLA for his absences. *Id.*

provided a copy of the "Request for or Notification of Absence" which was submitted on August 27, 2003, for the dates of August 22nd and August 24th which clearly show Plaintiff's absence was listed as "AWOL" (absent without leave) and "disapproved" for FMLA.  Doc. 60-3, p. 55 (Ex. B, p. 55).

### Attendance Suspension

Another of Ms. Busey's duties as secretary to the Plant Manager was to "write Restricted Sick Leave letters to employees when . . . asked to do so by their supervisors."  Doc. 60, ex. B; ex. 60-3, p. 4.  Plaintiff "was placed on Restricted Sick Leave on July 23, 2003," which means that Plaintiff would be required "to provide documentation for each instance of sick leave, which is brought about by a poor attendance record."  *Id.*  Being on restricted sick leave status "is not considered discipline and cannot be cited in discipline letters."  *Id.*  The memorandum advising Plaintiff that he was placed on Restricted Sick Leave contains a notation that Plaintiff told his supervisor to "mail it to" his home.  Doc. 60, ex. B; ex. 60-3, p. 29.  Plaintiff left the office and went home, and the memorandum was mailed to Plaintiff via certified mail.  *Id.*, at 28-29.

Defendants have presented evidence of Plaintiff's attendance at work.  Doc. 60-3 (ex. B).  In 2003, Plaintiff was scheduled to be off on Sunday and Monday, and to work the remaining five days of each week.  Doc. 60-3, pp. 4 and 32 (ex. B) (absences on calendar in yellow).  Plaintiff was absent 2 of his scheduled 20 days of work in February, and missed 8 of his scheduled 21 days of work in March.  *Id.*  Plaintiff missed 3 more days in April, just one day in May, but then 3 more days of work in June, 2003.  *Id.*  Plaintiff's "attendance was extremely poor the last six months of 2003."  Doc. 60, p. 4.

The records show that he missed 5 of his scheduled 23 days of work in July, missed 18 days in August, and missed 8 days of scheduled work in September.  Doc. 60-3, p. 32 (ex. B).  In October of 2003, Plaintiff missed 21 days of work, he missed 20 days in November, and missed 6 more days of work in December.  *Id.*

The attendance records for 2004 reflect that Plaintiff continued to miss work with unscheduled absences,[4] often recorded as "AWOL."  Doc. 60-3, pp. 4, 33-38 (ex. B) (absences on calendar in red).  In January, 2004, he missed 5 days of work with unscheduled absences.  Doc. 60-3, p. 33 (ex. B).  In February, Plaintiff missed 11 more days with unscheduled absences.  *Id.*  In March, 2004, Plaintiff did not work a single day and all absences (18) were unscheduled.  Doc. 60-3, p. 34 (ex. B).  In April, 2004, 16 days were designated as unscheduled absences.  *Id.*  In May, 2004, Plaintiff had only 1 day as an unscheduled absence, but had four more missed days of work (leave without pay), and worked 15 days.  Doc. 60-3, p. 35 (ex. B).  In June, Plaintiff was documented with another 9 days of unscheduled absences.  *Id.*  Plaintiff had no unscheduled absences in July, August, or September, 2004.  Doc. 60-3, pp. 36-37 (ex. B).  In October, there were 4 more days of unscheduled absences.  Doc. 60-3, p. 37 (ex. B). The 2004 year concluded with Plaintiff having 6 days of unscheduled absences in November and 2 more such days in December.  Doc. 60-3, p. 38 (ex. B).

In summary, Plaintiff had 94 unscheduled absences in 2003 and 72 such absences in 2004.  The total for the two years is 166 days absence without having scheduled the absence.

---

[4] On the exhibits, all of the red colored boxes represent unscheduled absences. Doc. 60-3, p. 33 (ex. B).

A request for disciplinary action was sent to Labor Relations in Jacksonville, Florida, by Plaintiff's supervisor on September 5, 2003.  Doc. 60-3, pp. 4-5, 41 (ex. B). It was requested that Plaintiff receive a 7-day suspension for having been absent without leave from August 22-23, 2003, and August 26, 2003 (3 days since Sunday and Monday were off days).  Doc. 60-3, pp. 4-5, 32, 41 (ex. B).  The notes supporting the request state that Plaintiff did not call eRMS, although Plaintiff stated that he did.[5]  Doc. 60-3, pp. 42-44 (ex. B); *see also* Exhibits H, K, and GG.  Prior to requesting that discipline be imposed, the supervisor verified that Plaintiff had failed to call in concerning his absences.  Doc. 60, p. 4; doc. 60-3, p. 42 (ex. B); *see also* docs. 60-9, p. 1 (ex. H) and 60-12, p. 1 (ex. K).

Plaintiff was given notice of a 7-day "no-time off suspension" on September 15, 2003.[6]  Doc. 60-3, pp. 4-5, 39 (ex. B).  Plaintiff was charged with being AWOL  on August 22-26, 2003, and failure to maintain a regular work schedule, in the period June 13, 2003, to August 2, 2003, (absences and tardiness).  *Id.*; *see also* doc. 60-34 (ex. GG).  The notice explained that, as to Charge 1, Plaintiff failed to report to work as scheduled in the period August 22-26, 2003, and "did not call in to report [his] absence to eRMS as [he had] been instructed to do."  Doc. 60-3, p. 39.[7]  The suspension notice

---

[5]  Nevertheless, because of Plaintiff's poor attendance at work, he was advised on July 23, 2003, of the requirement to provide documentation for "each instance of sick leave."  Doc. 60-3, p. 4 (ex. B).

[6] As a matter of clarification, the suspension was issued on September 15th and was, in part, for the disputed FMLA leave.  Plaintiff did not submit the required documentation (the WH380 form) for FMLA leave until the following day, September 16th.  Doc. 60-3, p. 3 (ex. B).

[7] This 7-day suspension was, in part, for not calling into eRMS on August 22nd, August 23rd, August 24th, or August 25th, although Plaintiff did not actually "serve time-

advised Plaintiff that he had been directed to provide documentation for his absence, but failed to so do.  *Id.*  Charge 2 alleged that Plaintiff failed "to maintain a regular work schedule" and the notice advised of various problems with his work attendance on nine days:  June 13, 2003, June 21, 2003, July 22-23, 2003, July 24-26, 2003, and August 1-2, 2003.  Doc. 60-3, p. 39 (ex. B); doc. 60, p. 4; *see also* doc. 60-34 (ex. GG).

The United States Department of Labor investigated Plaintiff's 2003 7-day suspension for attendance-related problems and concluded there was no violation of the Family and Medical Leave Act.  Doc. 60, p. 6; doc. 60-12, p. 46 (ex. K).  Plaintiff's discipline was solely the result of his attendance problems.  Doc. 60, p. 6.

Plaintiff received escalating discipline.  "Because of his terrible attendance problems, he was counseled, put on sick leave restrictions . . ., [given] a 7-day suspension (he was allowed to work during this time, as well as receive his pay and benefits), given a 14-day suspension, and later removed.'  Doc. 60-9, p. 3 (ex. H).

*After* the 7-day suspension letter was written, Plaintiff was granted some leave time under the FMLA.  Doc. 60-9, pp. 3-4 (ex. H).  However, the FMLA time still does not change the fact that Plaintiff did not report in to the automated system as required, did not provide documentation of his leave as required by his restricted sick leave status, and at the time his suspension was issued, he had *not yet* been approved for some FMLA leave.  *Id.*  Moreover, the belated FMLA leave, which still did not account for the entirety of Plaintiff's absences, did not nullify the violations alleged in charge 2, which "would still merit the 7-day suspension."  *Id.*; *see also* doc. 60-12, pp. 1-2 (ex. K).  An AWOL charge "is a more serious charge than failure to maintain a regular work

off with" the suspension.  Doc. 60-3, pp. 5, 39 (ex. B).

schedule in that an employee has either given no notification of his absence and has simply not shown up for work or the employee has been instructed to provide documentation of incapacity and has failed to do so."  Doc. 60-34, p. 1 (ex. GG).

In an affidavit, Labor Relations Specialist Harriet Dillhyon explains:

> Acceptable FMLA documentation for the time period August 5-25, 2003 was not received until September 16, 2003.  DOL FMLA regulations state that an employee must be allowed at least 15 calendar days from the date FMLA is requested to provide documentation (part 825.305 of the regulations).  In actuality [Plaintiff's] documentation was untimely and could have been disallowed in its entirety.  Regardless, his FMLA documentation does not negate the requirement to call to report his absence.

Doc. 60-12, p. 2 (ex. K) (citations omitted).  She further states that "[r]egardless of FMLA status, [Plaintiff] was required to notify management in advance that he would be absent from work, and, in retrospect, those dates should not have been approved as FMLA-protected."  *Id.*

There is evidence that Plaintiff "was AWOL from October 3 - December 6, 2003 and again from January 8-17, 2004, which warranted a 14-day suspension even with no prior elements of progressive discipline."  Doc. 60-34, p. 2 (ex. GG).  The 14-day suspension was reduced to a 13-day suspension due to a grievance settlement dated Jun 8, 2004.  Doc. 60-34, p. 2 (ex. GG).

"Plaintiff's excessive absences" was the "source of morale issues" at the Post Office.  Doc. 6-5, p. 2 (ex. D).  Plaintiff was "not dependable in reporting for work as scheduled" which "resulted in excessive overtime usage and" as an increase "work burden" on his co-workers.  *Id.*  Many complaints were received from Plaintiff's co-workers to Ms. Jackson, a Supervisor, at the U.S. Postal Service.  *Id.*  Plaintiff was deemed to be "irresponsible," one who under-performed and could not maintain regular

work attendance.  Doc. 60-8, p. 6 (ex. G).  Plaintiff "was frequently bickering with other people, was not dependable and was a distraction from other USPS employees doing their job."  Doc. 60-9, p. 4 (ex. H).  Mr. Willie Hightower, the Supervisor of Distribution Operations at the U.S. Postal Service, submitted an affidavit also stating that Plaintiff's "attendance was horrible."  Doc. 60-7, p. 1 (ex. F).  He states that Plaintiff "was excessively absent, including Absent Without Leave (AWOL), frequently did not even call in when he was going to be out, and was late in showing up to work."  *Id.* Furthermore, Plaintiff "would frequently take excessive breaks."  *Id.*

### Machine operations

### Two machines

Plaintiff was never required to operate two machines at once as he alleged happened on September 6, 2003.  Doc. 56, p. 6; doc 60, p. 5; doc. 60-9, p. 2 (ex. H); *see also* doc. 60-13, pp. 1-2 (ex. L).  While he was assigned to operate two different machines, he was never required to do so simultaneously.  *Id.*  It is true that two other employees, both of whom are Caucasian males, have operated two machines at once, but Plaintiff was not required to do so.  Doc. 60, p. 5; docs. 60-14, p. 1, and 60-15, p. 1 (exs. M, N).  On the day in question as claimed by Plaintiff, the volume of mail was very light.  Doc. 60, p. 5; doc. 60-16, p. 1 (ex. O).

Plaintiff's supervisor on that day, September 6, 2003, was Suzanne Monroe. Doc. 60-13, p. 1 (ex. L).  Ms. Monroe submitted an affidavit in which she stated that she did not direct him to operate two postal cancellation machines at once.  *Id.*  Plaintiff's "job description was to operate two postal cancellation machines, the Micro Mark (Mark II) and Advanced Facer Canceller (AFC)."  Doc. 60-13, p. 2 (ex. L).  "However, he was

never required to work both machines at once."  *Id.*  "On Saturdays, the volume of the mail was much lighter than during the week."  *Id.*; *see also* doc. 60-14 (ex. M).

### Stop button

On about January 20, 2004, when Plaintiff returned to work after a seven day absence, he discovered an emergency stop button on a canceling machine that was not working properly.  Doc. 60, p. 5; doc. 60-17, p. 4 (ex. P); *see also* doc. 60-18, p. 2 (ex. Q).  During Plaintiff's absence, the mail canceling system had been malfunctioning and Managers had initiated emergency procedures.  *Id.*  Those procedures would allow the canceling process to continue, but would provide safe working conditions for the employees.  *Id.*  The managers had a safety talk with the employees who working in the affected area concerning the emergency procedures.  *Id.*  Plaintiff was absent from work on that day and missed the safety talk.  *Id.*  None of Plaintiff's co-workers had a problem with the emergency procedures and none expressed any concerns over safety.  *Id.; see also* doc. 60-5, p. 1 (ex. D).  The machine "was always monitored and could be safely stopped at any time."  Doc. 60-7, p. 1 (ex. F).  Gerald L. Johnson, the Plant Manager, he stated in his affidavit:

> Mr. Wills was working NEAR a belt that had an unoperable stop switch.  We were working under emergency conditions, because the programming controller for the entire 010 (canceling operation) system had broken.  We had a supervisor and an Electronic Technician monitoring the system, starting and stopping each belt in the system manually as needed.  The belt in question could be turned off at any time.  Mr. Wills was in no danger. . . .

> It was explained to [Plaintiff] (by the supervisors on the floor) that the equipment was safe, but he refused to accept the explanation.  Even the other mailhandlers working in the same area tried to tell him his claim was baseless.  Everyone else was assisting in handling the emergency situation without complaints.

Doc. 60-18, p. 2 (ex. Q).

Plaintiff and the other employees of different races and genders worked in the same conditions.  Doc. 60, p. 6; docs. 60-5, p. 1 (ex. D), 60-7, p. 1 (ex. F), 60-17, p. 2 (ex. P), 60-18, pp. 2-3 (ex. Q).  Plaintiff stated in his EEO Affidavit that he was not aware of other co-workers who were treated more favorably with respect to working conditions.  Doc. 60, p. 6; doc. 60-19, pp. 1, 5 (ex. R).  Plaintiff's attendance problems were handled the same as any other employee with similar problems.  Doc. 60, pp. 6-7; doc. 60-21 (ex. T).[8]  Plaintiff never filed a formal administrative complaint concerning his 13-day suspension or his removal.  Doc. 60, p. 7; doc. 60-22, p. 3 (ex. U), doc. 60-23, p. 2 (ex. V).  Plaintiff did not file an administrative tort claim either.  Doc. 60, p. 7; doc. 60-35, p. 2 (ex. HH).

### Disability

Plaintiff alleges that he is impaired by depression and anxiety.  Doc. 60, p. 6; doc. 60-19, pp. 1, 5 (ex. R).  Plaintiff states under oath in his EEO Affidavit that his impairment did not substantially limit any major life activity.  Doc. 60, p. 6; doc. 60-19, pp. 1, 5 (ex. R).  Plaintiff states that he has not needed or asked for an accommodation for this impairment, nor has his physician asked for an accommodation for him.  Doc. 60, p. 6; doc. 60-11, pp. 2, 6-7 (ex. J), doc. 60-20, pp.1-4 (ex. S).  Plaintiff's supervisors likewise state that Plaintiff never requested any accommodations and they were unaware of any claimed disability.  Doc. 60, p. 6; doc. 60-5, p. 1 (ex. D), doc. 60-7, p. 2

---

[8] There is evidence that a Caucasian female, who was also employed as a mail handler, was treated similarly to Plaintiff.  Doc. 60-21 (ex. T).  That employee had a FMLA qualifying condition but "due to excessive absences, she did not qualify for FMLA in her last year of employment."  *Id.*  Progressive disciplinary measures were taken against her as well, also "progressing up to removal."  *Id.*

(ex. F), doc. 60-8, pp. 1, 3, 6 (ex. G), doc. 60-36, p. 2 (ex. II).  Plaintiff never submitted "any documentation indicating that he had a serious medical condition."  Doc. 60-7, p. 2 (ex. F); doc. 60-8, p. 6 (ex. G).

## Plaintiff's evidence

Plaintiff first filed a response to Defendant's summary judgment motion in July, 2003.  Doc. 57.  Plaintiff's amended response filed in October, 2007, doc. 68, refers to previously filed exhibits.  The evidence attached to document 57 has been considered where relevant.[9]  As with Defendant's documents, the references are to the page numbers on the electronic docket followed by the exhibit number.

Plaintiff has provided evidence by means of an affidavit from Margaret A. Taylor that in the late spring of 1995, he was employed as a Relief Tech 5, which meant that his job was to provide relief for Mr. Clark and Mr. Young, two mailhandlers who operated the AFC and the Micro Mark Cancellation Machine "[MMC]".  Doc. 57-2, p. 2 (ex. 2).  Each employee had two fifteen minute breaks and  a "half hour lunch plus a wash-up time for lunch."  *Id.*  This amounted to "approximately two to two hours and a half hour per day."  *Id.*  When Plaintiff was "not relieving on the AFC or the MMC he would work in the 010, the 020 or the platform loading and unloading mail trucks."  *Id.*  "Once the cancellation of mail was done, Mr. Wills would be assigned to other duties such as unloading, loading mail trucks and dispatching mail either incoming or outgoing."  *Id.*  "When Mr. Wills was initially awarded the relief Tech job there was only

---

[9] Evidence concerning altercations between Willie Hightower and Plaintiff are not relevant to the claims pending in this complaint and have not been considered.  These statements, some of which were not under oath, are: doc. 52-2, exs. 7, 9, 11; doc. 68-2, p. 63 (ex. 52).  Also irrelevant is the deposition of Mr. Hightower concerning these incidents.  Doc. 52-7, pp. 59-65 (ex. 33).

one AFC and one MMC.  It was not until a later date that the second AFC was installed in the Tallahassee Post Office."  *Id.*  Ms. Taylor does not state how long Plaintiff performed the duties of a Relief Tech 5.

Plaintiff disputes that he was employed as a Mail Processing Machine Operator and provided his own affidavit[10] stating that he was "a relief Tech operator which means that I relieve the machine operators when they go on break or have days off."  Doc. 57-2, p. 5 (ex. 4).  Plaintiff states that he "would unload mail from the truck, move pallets of mail around the facility for processing."  *Id.*  He states that he had to move the 800-pound pallets around by using a hand-truck since he could not get forklift training.  *Id.*

_____

[10] Plaintiff's affidavit concludes with the following statement: "All the above written things are true to the best of my recollection and knowledge."  Doc. 57-2, p. 8 (ex. 4).  Plaintiff's affidavit is inadmissible in its present form because of the use of the qualifying language that the statements are correct "to the best of [his] recollection and knowledge."  Likewise, the declaration by Margaret A. Taylor, a supervisor in 1995, is inadmissible as she also stated that her information is "true to the best of my recollection."  Doc. 57-2, p. 2 (ex. 2).

A declaration expressing that statements are true to the best of one's recollection carries with it the implication that the affiant does not know whether the statements are true and correct and the affiant does not wish to be held accountable if they are not.  While such a phrase ("to the best of my recollection") is common speech, it equivocates and, therefore, does not meet the requirements of Rule 56(e) that an affidavit "be made on personal knowledge" and "show affirmatively that the affiant is competent to testify to the matters stated therein."  Rule 56(e)'s personal knowledge requirements prevents such statement "from raising genuine issues of fact sufficient to defeat summary judgment."  Pace v. Capobiano, 283 F.3d 1275, 1278-79 (11th Cir. 2002).  Accordingly, Plaintiff's "declaration" and that of Ms. Taylor should not be considered in response to Defendants' summary judgment motion.

Notwithstanding these defects, the Court has an obligation to allow the parties to remedy obvious defects in summary judgment materials, although a court is not required or permitted to become counsel to a litigant, even one who proceeds *pro se.* Griffith v. Wainwright, 772 F.2d 822, 825, n.6 (11th Cir. 1985), *citing* Barker v. Norman, 651 F.2d 1107, 1128-29 & n.26 (5th Cir. Unit A 1981).  Plaintiff probably could correct the deficiencies in the declarations.  Therefore, the declarations of Taylor and Plaintiff have been reviewed for the relevant facts as shown above.

Plaintiff stated that he was allowed to start the forklift training, but when Marilyn Dickens became his supervisor, the training was stopped because she said he did not need the training.  *Id.*

Plaintiff reports that he "called into work every time [he] was absent unless it was an emergency and [he] could not call in."  *Id.*  He states: "Sometimes my condition gets really bad to where I need immediate attention and I go to my counselor, doctor or hospital."  *Id.*  Plaintiff acknowledges that he "was suspended in 2003 over [his] lengthy absence" and that in July, he "was denied leave and written up and placed on restricted sick leave . . . ."  *Id.*  He also notes that his FMLA leave "was denied because they did not have my documentation prior to my being sick."  *Id.*  He states: "I do not know when my condition will interfere with my work, it depends on many factors, including the stress and harassment  at work."  *Id.*  He states that he asked for breaks when under stress at work, sometimes when he needed to take his medication, "but they think I am asking for time to goof off, even when I tell them I need medication."  Doc. 57-2, p. 4 (ex. 4).  He states:

> I have a mental/emotional disability that affects my short term memory and the way I understand things, so many times I have to ask for directions more than once to make sure I understand them.  Without my medication it is really hard to understand directions, but with my medication, I can do my work.

*Id.*

Plaintiff states that he felt he "was discriminated against because [he] did not fit in with [his] disability, and race."  Doc. 57-2, p. 7 (ex. 2).  He also states that he felt that he was "treated differently because [he] transferred from New Jersey and the other people were mainly from here and had a clique that [he] did not fit into."  *Id.*

Plaintiff has provided the affidavit of Michael H. Joyner, President of the Local 318, National Postal Mail Handlers Union.  Doc. 57-2, pp. 13-14 (ex. 8).  Joyner states that Plaintiff was a former Mail Handler.  *Id.*, p. 13.  Joyner asserts that Plaintiff's absences from August 5 through 25, 2003, were eventually found to be covered by the FMLA, and he argues that, therefore, his suspension for 7 days violated the FMLA.[11]  *Id.*

Joyner states that the since Plaintiff's "weekend" was Sunday and Monday, when a holiday fell on those days, his "holiday" was Saturday.  *Id.*  He states that the records go back to the second quarter of 2003, and Plaintiff worked 9 out of 11 such "holidays" on a Saturday.  *Id.*  He states that two or three other Mail Handlers also had Saturday as a "non-scheduled" day and had signed up on the Overtime Desired List.  *Id.*  Presumably Joyner is saying that those persons could have worked the Saturday in place of Plaintiff.

Joyner comments that he thinks it would be "prudent" for management to train Mail Handlers on the Powered Industrial Truck (PIT), the forklift.  Doc. 57-2, p. 14 (ex. 8).  "Rarely does a mailhandler work a tour of duty where he does not work at a task that would be more efficiently and timely accomplished with the use of a PIT."  *Id.*

James Sampson has provided an affidavit concerning Plaintiff's work as a Relief Tech 5 in 1995.  Doc. 57-2, pp. 16-17 (ex. 10).  He provides evidence that Plaintiff had initial forklift training in 1995 as a Relief Tech 5.  *Id.*, p. 17.

Nick Mosezar, a subsequent President of Local 318, wrote a letter to Plaintiff on November 17, 2005.  Doc. 57-2, p. 35 (ex. 18A).  Mr. Mosezar states that the union

---

[11] Plaintiff's second affidavit has also been reviewed.  It is largely conclusory and repeats evidence already in the record, and otherwise does not supply relevant evidence for consideration.  Doc. 68-2, pp. 23-24 (ex. 50).

made a decision not to arbitrate over Plaintiff's removal from his job "due to the lack of merit and fact circumstances of said case and the extremely low likelihood of prevailing at the hearing."  *Id.*

Plaintiff asserts that he filed an administrative tort claim under the Federal Tort Claims Act when he filed one of his EEO claims.  Doc. 68, pp. 33-34, citing Defendant's ex. MM.  The EEO charge does not allege any torts and does not seek any money damages.  Doc. 57-2, pp. 1-3 (ex. MM).  It only alleges discrimination due to race, gender, and disability.  *Id.*, p. 1.  None of the factual allegations could reasonably read as an attempt to begin the process for filing a federal tort claim.

**Analysis**

**Exhaustion**

Under well established law, pleadings filed by litigants without lawyers are entitled to liberal construction.  Haines v. Kerner, 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972), *cited in* Eidson v. Arenas, 910 F.Supp. 609, 612 (M.D. Fla.,1995). Yet, even giving that liberal reading, a *pro se* plaintiff's employment discrimination complaint remains "limited by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination."  Gregory v. Ga. Dep't of Human Res., 355 F.3d 1277, 1280 (11th Cir. 2004) (*quoting* Alexander v. Fulton County, 207 F.3d 1303, 1332 (11th Cir. 2000)).  In other words, "the allegations in a judicial complaint filed pursuant to Title VII may encompass any kind of discrimination like or related to the allegations contained in the charge."  Gregory, 355 F.3d at 1280, *explaining* Sanchez v. Standard Brands, Inc., 431 F.2d 455, 466 (5th Cir. 1970).  Thus, the charges Plaintiff filed with the Equal Employment Opportunity

Commission must be carefully reviewed to determine whether all claims are properly

exhausted and, accordingly, can be decided in this litigation.

Plaintiff filed two formal complaints (case 1H-321-0106-03 and case 1H-321-

0022-04).  Doc 60-40 (ex. MM); doc. 60-41 (ex. NN).

In the earliest EEO formal complaint, filed on November 19, 2003, Plaintiff

complained of these events, all which occurred in September of 2003:  that he was

denied forklift training; that he was not allowed to work overtime although Geneva

Scurry was permitted to do so; that he was issued a suspension even though he had

been approved for FMLA leave; that Willie Hightower "became very hostile" to Plaintiff

when telling him to sign on September 23, 2003; that he was ordered to operate two

machines at the same time; and that he had to work on his holiday even though an

employee with less seniority was given time off.  Doc. 60-40, pp. 1-2 (ex. MM).  He

claimed discrimination due to race, gender, and disability.  *Id.*, p. 1.

In the second formal EEO Complaint, filed on January 20, 2004, Plaintiff

complained of being ordered to operate a Mark II machine that would not stop.  Doc. 60-

41, p. 1 (ex. NN).  He claimed discrimination due to race and disability.  *Id.*

Shortly after his removal (termination) on April 15, 2005, Plaintiff was interviewed

by an EEO counselor.  Doc. 60-39, p. 1 (ex. LL).  Plaintiff brought up the removal in this

interview, alleging that this was caused by race and gender discrimination, but he did

not allege that his removal was due to disability discrimination.  *Id.*  Moreover, this

interview was not a formal complaint that his removal was based upon race or gender

discrimination.  The only two formal complaints are the Exhibits MM and NN discussed

above, and those complaints did not mention the 13 day suspension or removal.  Doc.

60, p. 7; *see also* doc. 60-23 (ex. V).[12]

Accordingly, only the following seven claims of race and disability discrimination[13]

can proceed in this court:  (1) that Plaintiff was required to work on his holiday on

August 30, 2003; (2) was required to work two machines at the same time in

September, 2003; (3) was denied forklift training in September, 2003; (4) was denied

overtime during September, 2003; (5) on September 18, 2003, was issued a 7-day

suspension; (6) on September 23, 2003, Willie Hightower was hostile; and (7) was

ordered to work in unsafe conditions because the Mark II machine would not stop.  *See*

doc. 60-44 (ex. QQ).  Defendant is entitled to summary judgment any other claims

because they were not part of the two EEO complaints, nor would they have reasonably

grown out of the investigation from those complaints.

**Claims concerning Willie Hightower:**

Plaintiff alleged in his EEO complaint dated November 12, 2003, that Willie

Hightower was hostile to him on September 23, 2003.  Doc. 60-40, pp. 1-2 (ex. MM).  In

the second amended complaint, Plaintiff alleged only two specific incidents of a

"physical altercation" between himself and Willie Hightower, both occurring in 1995.

Doc. 56, p. 4.  Plaintiff further alleged that Mr. Hightower continued to "harass Plaintiff

---

[12] Exhibit V is an affidavit by the "EEO/ADR Specialist," Sherry Shine-Green, that asserts review of the records reveals Plaintiff never initiated "a formal EEO Complaint alleging discrimination regarding his suspension and removal from employment" as he alleged in the Second Amendment Complaint.  Doc. 60-23, p. 2 (ex. V).

[13] The first six claims in the EEO complaint were based upon race, gender, and disability discrimination, but Plaintiff omitted any gender discrimination claim in his second amended complaint..  The seventh claim in the second EEO complaint omitted a claim of gender discrimination.

on the job," but Plaintiff did not identify the specific manner of any harassment or when that took place.  The EEO investigation arising from a claim of harassment on September 23, 2003,could not reasonably have been expected to investigate claims of harassment as far back as 1995.  Thus, Plaintiff did not exhaust his administrative remedies in his EEO charge with respect to harassment as far back as 1995.[14]

Even if the merits of this claim were to be considered, Defendant is entitled to summary judgment.  Title VII protects an employee from being required to "work in a discriminatorily hostile or abusive environment."  Harris v. Forklift Systems, Inc., 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993), *quoted in* National R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 116, 122 S.Ct. 2061, 2074 (2002) (other citations omitted).  Isolated incidents are not sufficient to support such a claim.  Only "[w]hen the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' Title VII is violated."  Harris, 510 U.S., at 21, 114 S.Ct. 367 (citations omitted), *quoted in* National R.R. Passenger Corp., 536 U.S. at 116, 122 S.Ct. at 2074.  To review such a claim, a Plaintiff must demonstrate: "(1) that he belongs to a protected group; (2) that he has been subject to unwelcome harassment; (3) that the harassment must have been based on a protected characteristic of the employee, such as national origin; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that the employer is

---

[14] Plaintiff contends in his own revised motion for partial summary judgment, doc. 70, that he exhausted his claim in EEO case number 1H-321-0106-03.  That is the EEO complaint dated November 12, 2003, referenced above.  Doc. 60-40 (ex. MM).

responsible for such environment under either a theory of vicarious or of direct liability."

Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1275 (11th Cir. 2002).

Plaintiff provides no evidence that any such "harassment" from Willie Hightower, whether on September 23, 2003, or years earlier, was due to a protected characteristic or status.  No evidence exists in this record that any hostility towards Plaintiff was due to anything more than a personality conflict.  That another employee may be unreasonably "hostile" is not a viable Title VII claim because "Title VII is not a federal 'civility code.' " Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 118 S.Ct. 998, 1000-02, 140 L.Ed.2d 201 (1998), quoted in Mendoza v. Borden, Inc., 195 F.3d 1238, 1245 (11th Cir. 1999).  In other words, Title VII does not permit an employee to sue based on "the ordinary tribulations of the workplace," including isolated abusive language, gender-related jokes, occasional teasing, and the like.  See Faragher v. City of Boca Raton, 524 U.S. 775, 118 S.Ct. 2275, 2283, 141 L.Ed.2d 662 (1998).  Federal law does not require that all persons treat each other politely.  There is no evidence in this record that Willie Hightower took any action against Plaintiff due to Plaintiff's race, age, sex, or other protected category.  For these two reasons, Defendant is entitled to summary judgment on this claim.

Defendant is also entitled to summary judgment on Plaintiff's state law tort claims for negligent retention, negligent infliction of emotional distress, and the intentional infliction of emotional distress.  Because these are tort claims, Defendant is correct in arguing that Plaintiff's exclusive remedy is under the Federal Tort Claims Act, 28 U.S.C. § 2671, et seq.  Doc. 60, pp. 9-10.  Under 28 U.S.C. § 2675(a), an action may "not be instituted" unless the Plaintiff "shall have first presented the claim to the appropriate

Federal agency and his claim shall have been finally denied by the agency in writing and sent by certified or registered mail."  Plaintiff did not submit these claims under the procedures established by the Federal Tort Claims Act.  Thus, Defendant is entitled to summary judgment on all of these tort claims.

While considering this claim, it is noted that Plaintiff filed his own motion for partial summary judgment, doc. 62, which was then replaced by his revised motion for partial summary judgment.  Doc. 70.  Plaintiff argued there that Defendant "did not assert any defense, affirmative or otherwise, for the claim regarding the negligent retention of Willie Hightower as a supervisor over Plaintiff."  Doc. 70, p. 2.  As noted above, Plaintiff's assertion is misplaced because Defendant *did* assert a defense. Although Defendant did not specifically argue the Plaintiff's claim for the "negligent retention" was barred because Plaintiff failed to pursue this claim through the Federal Tort Claims procedure, the Defendant *did* argue that Plaintiff did not exhaust the tort claims.  Doc. 60, pp. 9-10.  This claim is part of the tort claims.  Furthermore, Defendant argued that if Plaintiff had any cause of action under the Federal Tort Claims Act, "the tort claims in this matter should be dismissed" because Plaintiff failed to name the proper Defendant.  *Id.*, at 10-11.  Under the Federal Tort Claims Act, 28 U.S.C. § 2679(a), the agency is not the proper Defendant; rather, claims concerning any wrongful or negligent act are to be brought "against the United States."  Thus, Defendant did assert a defense and Plaintiff's revised motion for partial summary judgment should be denied.

Moreover, as noted above, Plaintiff has failed to provide any evidence to support such a claim because there is no evidence of any unlawful discriminatory harassment

by Willie Hightower.  Thus, the employer cannot be vicariously liable for retaining Willie Hightower as a supervisor.

**Disability Claims:**

There are six remaining claims which Plaintiff brings both as disability and race discrimination.  Doc. 56.  Plaintiff's disability claims are brought under the American with Disabilities Act and the Rehabilitation Act.  The Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, . . . be subjected to discrimination under any program or activity . . . conducted by . . . the United States Postal Service."  29 U.S.C. § 794(a).  Rolland v. Potter, 492 F.3d 45, 47 (1st Cir. 2007).  Section 705(20) of the Act defines an "individual with a disability" as "any person who . . . has a physical or mental impairment which substantially limits one or more of such person's major life activities" or "has a record of such an impairment" or "is regarded as having such an impairment."  *Id.*, § 705(20)(B), *quoted in* Rolland, 492 F.3d at 47.  This is a demanding standard which requires "a permanent or long term impairment" which "prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives."  Rolland, 492 F.3d at 47-48, *explaining* Toyota Motor Manufacturing, Kentucky, Inc. v. Williams, 534 U.S. 184, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002).

The ADA provides very similar language:  no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  A disability under the ADA is

also defined similarly:  "(A) a physical or mental impairment that substantially limits one

or more of the major life activities of such individual; (B) a record of such an impairment;

or (C) being regarded as having such an impairment."  42 U.S.C. § 12102(2).

> The Supreme Court has explained that "[w]hen the major life activity under
> consideration is that of working, the statutory phrase 'substantially limits'
> requires, at a minimum, that plaintiffs allege they are unable to work in a
> broad class of jobs."  *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 491,
> 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999).  Indeed, the Equal Employment
> Opportunity Commission (EEOC) regulations interpreting the ADA make it
> abundantly clear that an individual's ability to work is "substantially limited"
> when the individual is "significantly restricted in the ability to perform either
> a class of jobs or a broad range of jobs in various classes as compared to
> the average person having comparable training, skills and abilities.  The
> inability to perform a single, particular job does not constitute a substantial
> limitation in the major life activity of working."

D'Angelo v. ConAgra Foods, Inc., 422 F.3d 1220, 1227 (11th Cir. 2005), *quoting* 29

C.F.R. § 1630.2(j)(3)(i).  Additionally, the Court has stated that "[a] person whose

physical or mental impairment is corrected by medication or other measures does not

have an impairment that presently 'substantially limits' a major life activity."  Sutton, 527

U.S. at 482-83, 119 S.Ct. at 2146-47; *quoted in* Greenberg v. BellSouth

Telecommunications, Inc., 498 F.3d 1258, 1264 (11th Cir. 2007).

Federal law prohibits discrimination against a qualified individual with a disability

"who, with or without reasonable accommodation, can perform the essential functions of

the employment position that such individual holds or desires."  42 U.S.C. § 12111(8).

Accordingly, a plaintiff "must show either that he can perform the essential functions of

his job without accommodation, or, failing that, show that he can perform the essential

functions of his job with a reasonable accommodation."  Davis v. Fla. Power & Light

Co., 205 F.3d 1301, 1305 (11th Cir. 2000); *cited in* D'Angelo, 422 F.3d at 1229.

Thus, to survive Defendant's summary judgment motion, Plaintiff has the burden of establishing that (1) he has a disability as defined by the Act, (2) "he is a 'qualified individual,' which is to say, able to perform the essential functions of the employment position that he holds or seeks with or without reasonable accommodation, and (3) the defendant unlawfully discriminated against him because of the disability." Reed v. The Heil Co., 206 F.3d 1055, 1061 (11th Cir. 2000), *quoted in* D'Angelo, 422 F.3d 1220, 1226 (11th Cir. 2005).  Plaintiff must also show that the employer was aware of, meaning had "actual knowledge" of the disability and that the unfavorable employment decision was due to, or because of, the disability.  Cordoba v. Dillard's, Inc., 419 F.3d 1169, 1183 (11th Cir. 2005), *citing* Silvera v. Orange County Sch. Bd., 244 F.3d 1253, 1262 (11th Cir. 2001); Brungart v. BellSouth Telecomm., Inc., 231 F.3d 791, 800 (11th Cir. 2000).

Defendant's evidence, discussed above, demonstrates without genuine dispute of fact that many elements of proof are missing from Plaintiff's disability claim.  There is no genuine dispute of material fact that Plaintiff's experience of depression and anxiety do not substantially limit any major life activity.  Plaintiff states under oath in his second EEO affidavit in case number 1H-321-0022-04 that his impairment did not substantially limit any major life activity.  Doc. 60, p. 6; doc. 60-19, pp. 1, 5 (ex. R).  In his first EEO affidavit, when asked in question 14 to state his mental disability, Plaintiff responded: "depression, anxiety."  Doc. 60-11, pp. 2, 6 (ex. J).  When asked in question 15 whether the mental disability was a permanent condition, Plaintiff answered:  "I don't know my Doctor said it may or may not go away."  *Id.*, pp. 2, 7.  When asked in question 16 whether his disability substantially impaired any major life activity such as "walking,

seeing, hearing, speaking, breathing, learning, working, etc.," Plaintiff responded that he had "very bad headache (migraine)" which rendered him unable to perform "work duties as required." *Id.*, pp. 2, 7 (ex. J).  A migraine headache, however, is not a disability claimed by Plaintiff in this case.

Plaintiff also states that he has not needed or asked for an accommodation for this impairment, nor has his physician asked for an accommodation for him.  Doc. 60, p. 6; doc. 60-11, pp. 2, 6-7 (ex. J), doc. 60-20, pp.1-4 (ex. S).  Plaintiff's supervisors likewise state that Plaintiff never requested any accommodations and they were unaware of any claimed disability.  Doc. 60, p. 6; doc. 60-5, p. 1 (ex. D), doc. 60-7, p. 2 (ex. F), doc. 60-8, pp. 1, 3, 6 (ex. G), doc. 60-36, p. 2 (ex. II).  Defendant has further presented evidence that Plaintiff never submitted "any documentation indicating that he had a serious medical condition."  Doc. 60-7, p. 2 (ex. F); doc. 60-8, p. 6 (ex. G).   This is further evidence that Plaintiff was not substantially limited in a major life activity, and that Defendant had no reason to perceive that he was so limited.

In response to the pending summary judgment motion, Plaintiff has presented argument that he is disabled under federal law.  Doc. 68, p. 9, *et seq.*  Plaintiff contends that the statements made in his deposition were made "without a clear understanding of what 'substantially limited', 'severely restricts', 'major life activity', or 'reasonable accommodation' meant under the law."  *Id.*, at 10.  Plaintiff now asserts, by way of argument, that he now understands "his disability is a covered disability."  *Id.*, at 11. Plaintiff states that "his mental disability interferes with work and cognitive understanding."  *Id.*

In support of that statement, Plaintiff points to evidence of a "medical certification and/or clearance to return to work."  Doc. 57-7 (ex. 35).  That document, however, reveals that Plaintiff was "fit for full duty" as of August 26, 2003.  *Id.*, p. 1 (p. 103 if viewed as a consolidated document).  Plaintiff's treating physician also stated that Plaintiff was "not presently incapacitated."  *Id.*, p. 2 (p. 104 as a consolidated document).  The doctor indicated Plaintiff's condition was "improved" with counseling and medication.  *Id.*  This evidence reveals that even if Plaintiff could be considered to have a temporary impairment, Plaintiff's own doctor reported that he was improved and fit to work with the corrections by medication and counseling.

The undisputed evidence in this case falls short of establishing that he is "substantially limited" in any major life activity.  Rather, the evidence reveals Plaintiff's own perception that he was not limited.  Those perceptions, given at a time close to the events in question, are strong evidence that Plaintiff's mental status did not limit his life activities.  The suggestion now, presented through argument and not evidence, is insufficient to create a genuine dispute of material fact.  It cannot then be presumed that Plaintiff was regarded as having a disability under the law by his supervisors when Plaintiff himself did not regard himself in this fashion.

Even more persuasive is Plaintiff's own concession that he never asked for any accommodation in his work environment.  No accommodations were requested because no accommodations necessary.  Though Plaintiff has shown that he suffers from anxiety and depression, he has not shown that his condition rises to the level of a "disability" as defined by either the Rehabilitation Act or the ADA.

Plaintiff's argument that his requests for forklift training were requests for a reasonable accommodation, doc. 68, p. 12, is not persuasive.  Plaintiff testified under oath in his deposition that he "never asked for accommodations" from the Post Office.  Doc. 60-20, pp. 1, 3 (ex. S).  Moreover, the evidence is that Plaintiff repeatedly asked for forklift training and his requests were denied because such training was not necessary for Plaintiff to perform his job as a Machine Operator.  Thus, such training could not have been a reasonable accommodation because it would not have helped Plaintiff perform his job.  Further, there is no evidence on this record that Plaintiff requested such training so that he could perform a *different* job as an accommodation, or that driving a forklift would have helped him cope with depression and anxiety.

Plaintiff has now attempted to present a list of other "reasonable accommodations" that he suggests that the Post Office could have provided without "undue hardship."  Doc. 68, p. 13.  Defendant cannot, however, be held liable for not providing an accommodation that was never requested.  Plaintiff never sought other job-related accommodations and these requests, made during litigation, are too late.

Plaintiff, however, has presented argument that his "supervisors" were given "paperwork from his doctors."  Doc. 68, p. 13.  To support that assertion, Plaintiff points to several exhibits.  Plaintiff's exhibit 54, however, is a "progress note" from a physician dated October 1, 2003, noting Plaintiff has depression which was being treated with Paxil.  Doc. 68-2, p. 34 (ex. 54).  The exhibit also states that Plaintiff reported having a "stressful work environment" and that he was given a "work excuse."  *Id.*  This exhibit falls short of demonstrating knowledge of a "disability;" rather, it is simply a reason for Plaintiff's absence from work.  Plaintiff also pointed to exhibit 57, which is a doctor's

excuse for work for a three day absence, beginning on October 16, 2003.  Doc.68-3, p. 5 (ex. 57).  This exhibit is insufficient to demonstrate Plaintiff's supervisors were advised that Plaintiff suffered from a "disability."  The third exhibit Plaintiff has pointed to is exhibit 58.  Doc. 68-3, p. 6 (ex. 58).  This exhibit is simply a colonoscopy procedure report and has no bearing on this case or an alleged "disability" for depression or anxiety.

It is "insufficient for individuals attempting to prove disability status under this test to merely submit evidence of a medical diagnosis of an impairment."  Toyota Motor Mfg., Ky., Inc. v. Williams, 534 U.S. 184, 198, 122 S.Ct. 681, 691, 151 L.Ed.2d 615 (2002).  Instead, one must "prove a disability by offering evidence that the extent of the limitation [caused by their impairment] in terms of their own experience . . . is substantial."  Albertson's, Inc. v. Kirkingburg, 527 U.S. 555, 567, 119 S.Ct. 2162, 144 L.Ed.2d 518 (1999).  Not everyone who suffers from depression or anxiety is disabled, and indeed, few such people are disabled.  Furthermore, an impairment must be "permanent or long term" and work excuses for several days absences fall woefully short of that requirement.  Toyota Motor Mfg., Ky., Inc., 534 U.S. at 198, 122 S.Ct. at 691.

Plaintiff asserts that the EEO investigation should have given his supervisors notice that he claimed he had a disability.  Doc. 68, pp. 13-14.  However, the documents generated during that investigation and Plaintiff's requests for time off also fall short of demonstrating a "disability," much less that Plaintiff's supervisors knew of it.  Indeed, the documents themselves reveal that none of Plaintiff's supervisors had any knowledge that Plaintiff had a "mental disability."  See, e.g., doc. 60-8, pp. 3-6 (ex. G).  During the

EEO investigation the supervisors were asked if they were aware that Plaintiff had a mental disability (depression or anxiety); all answered, "No."  The follow-up question was whether Plaintiff ever provided "medical documentation to substantiate his mental disability;" again, all answered, no.  Providing medical documentation to support a request for FMLA leave is *not* the same as providing documentation to show one's employer that the employee suffers from a "disability" as defined by the ADA or the Rehabilitation Act.

In sum, Plaintiff has not demonstrated a genuine issue of material fact as to this claim of disability discrimination.  While Plaintiff has shown he suffers from depression and anxiety, that falls short of showing that Plaintiff had a "disability" due to those conditions.  Moreover, Plaintiff has not shown that any supervisor had any knowledge of any disability or regarded Plaintiff as disabled.  Finally, Plaintiff has not shown that his depression and anxiety are impairments which are either "long term" or permanent conditions.  Therefore, summary judgment should be granted in Defendant's favor on all of Plaintiff's disability claims.

**Title VII Claims:**

Title VII makes it unlawful for an employer "to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a).  Plaintiff's Title VII claims must be analyzed under the framework established by the United States Supreme Court in the case of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).  There, the Court established a burden-shifting framework for

proving a discrimination case based upon circumstantial evidence.  First, a plaintiff must

establish a *prima facie* case of discrimination by showing he was a qualified member of

a protected class and was subjected to an adverse employment action not imposed on

other similarly situated employees outside his protected class.  Wilson v. B/E

Aerospace, Inc., 376 F.3d 1079, 1087 (11th Cir. 2004), *citing to* McDonnell Douglas,

411 U.S. at 802, 93 S.Ct. at 1824; Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir.

1997).  When the plaintiff establishes a *prima facie* case, creating a presumption of

discrimination, the burden of production shifts to the employer to articulate a legitimate,

nondiscriminatory reason for its actions.  Wilson, 376 F,3d at 1087, *citing* Texas Dep't of

Community Affairs v. Burdine, 450 U.S. 248, 254, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207

(1981).

> If the defendant then fails to meet its burden of production, the plaintiff is
> entitled to judgment as a matter of law based on his unanswered prima
> facie case.  *Id.; Wright v. Southland Corp.,* 187 F.3d 1287, 1291 (11th Cir.
> 1999).  On the other hand, if a plaintiff fails to establish a prima facie case,
> the defendant is entitled to judgment as a matter of law (unless the plaintiff
> can prove discrimination by some other means, such as by direct
> evidence of discrimination).  *See, e.g., Cooper v. Southern Co.,* 390 F.3d
> 695, 745 (11th Cir. 2004) (affirming the district court's grant of summary
> judgment to the defendant in a compensation discrimination case because
> the plaintiff failed to establish her prima facie case); *Schoenfeld v. Babbitt*,
> 168 F.3d 1257, 1267 (11th Cir. 1999) (same).

Collado v. United Parcel Service, Co., 419 F.3d 1143, 1150 (11th Cir. 2005).

Defendant argues that "Plaintiff cannot establish a prima facie case of disparate

treatment discrimination with respect to any of the alleged actions, because he cannot

identify a similarly situated comparison employee who was treated more favorably."

Doc. 60, p. 18.  Defendant has presented evidence that each of the persons Plaintiff

identified as being "similarly situated" to him were not in fact similarly situated with

respect to the particular employment opportunity in question.  *Id.*, at 18-20.  Plaintiff has not provided any evidence to raise a genuine dispute of material fact as to the existence of "similarly situated" persons who were treated differently.  Since Plaintiff has not come forward with evidence to prove a *prima facie* case of discrimination, Defendant is entitled to summary judgment on all of Plaintiff's Title VII claims.

For example, Plaintiff claimed he was required to work on his holiday on August 30, 2003, but Connie Maciora was allowed to be off that day.  Defendant has shown that Plaintiff and Ms. Maciora worked in different areas.  Plaintiff was a machine operator and Ms. Maciora was a flexible mail handler.  Plaintiff was a full-time employee.  Ms. Maciora was a part-time employee.  Treatment of full-time employees and part-time employees will naturally vary.  There were more mail handlers than machine operators.  Furthermore, during the month of August, Plaintiff was absent most of the time and returned to work on Wednesday, August 17th.  Doc. 60-12, p. 1.  When Plaintiff did return to work he was told he had to work on Saturday, August 30th, which would have been Plaintiff's holiday.  *Id.*  Ms. Maciora, on the other hand, had previously submitted a request for annual leave for that day and, thus, she was not required to work.  *Id.*  Thus, Ms. Maciora was not similarly situated to Plaintiff.

Nor is there any evidence that this employment decision was based on racial discrimination.  Rather, the only evidence is that it was based on the needs of the Post Office in processing the mail in an efficient manner.  Plaintiff had already been absent for most of August and, in fact, only worked August 27-30th of that month.  Doc. 60-3, p. 32.  Defendant is entitled to summary judgment as to this claim.

No evidence has been presented to show that Plaintiff was required to work two machines at the same time in September, 2003.  Plaintiff was not treated differently than any other employee because he was never ordered to simultaneously operate two machines.  Defendant is entitled to summary judgment on this claim.

There has been no evidence that the denial of forklift training in September, 2003, was based on discrimination.  All of the evidence presented reveals that no other employee who occupied Plaintiff's position had forklift training.  Thus, Plaintiff has failed to prove a *prima facie* case.  Further, there is no evidence that such training was necessary for Plaintiff to perform his primary job as a machine operator.  Defendant's reasons for the decision were not raced-based.  Thus, this claim fails as well.

There is no evidence that the denial of overtime during September, 2003, was due to discrimination.  Rather, the evidence establishes that there was no need for Plaintiff to work overtime because there was already another machine operator available to work during that time, Mr. Kenny Young.  Mr. Young was listed on the "Overtime Desired List," and Plaintiff was not, and thus not similarly situated.  Moreover, Geneva Scurry was allowed to work overtime and was called in to replace another mail handler.  Ms. Scurry was not performing the same work as Plaintiff would have performed.  There has been no evidence of discrimination based on these facts.  Rather, the *prima facie* case fails and, further, Defendant has presented legitimate non-discriminatory reasons to support the employment decision made.

Defendant's evidence reveals that the 7-day suspension in September, 2003, was justified based upon Plaintiff's attendance record.  Plaintiff has not shown that any other employee on restricted sick leave status was treated any differently.  Plaintiff was

placed on such status because of his poor attendance.  Plaintiff was required to provide documentation each time he was out on sick leave.  Even with that requirement, his attendance remained poor.  Plaintiff was required to report in to the eRMA System when he would be absent, but Plaintiff did not always comply.  Plaintiff's attendance records show many dates he was absent without authorization and discipline was justified due to these failures.

Plaintiff has disputed Charge 1 of the suspension based on FMLA leave. However, the notice was issued on September 15, 2003.  At *that* time, Plaintiff had not yet submitted the paperwork for FMLA leave.  Plaintiff did not finally comply by providing the paperwork until after the notice was issued.  Even discounting Charge 1, discipline was still justified due to the nine separate days of absences listed in Charge 2.  Plaintiff failed to maintain a regular work schedule.  Since he had already been placed on restricted sick leave, this was the next level of discipline.  The undisputed evidence demonstrates that discipline was imposed on a progressive and non-discriminatory basis.  Summary judgment is appropriately entered in Defendant's favor on this claim.

Plaintiff's final Title VII discrimination claim is that he was ordered to work in unsafe conditions because the Mark II machine would not stop.  *See* doc. 60-44 (ex. QQ).  There is no evidence that Plaintiff was singled out to work in conditions unique to him.  Plaintiff was working under the same condition as all other employees working on that machine.  There can be no discrimination in this situation.  That Plaintiff objected to these conditions is not sufficient to prove discrimination.

There has simply been no evidence presented to show that Plaintiff was treated differently because of his race.  The evidence reveals a legitimate basis for all decisions

made.  Plaintiff has not come forward with any evidence which shows that any of Defendant's reasons were a mere pretext for discrimination.  Thus, Defendant should be granted summary judgment on all of Plaintiff's Title VII claims.

**Retaliation**

Plaintiff claims that Defendant retaliated against him because he filed EEO complaints.

> To establish a prima facie case of retaliation, a plaintiff must show that (1) she engaged in protected activity, (2) she suffered an adverse employment action, and (3) there was a causal link between the protected activity and the adverse employment action.

Stavropoulos v. Firestone, 361 F.3d 610, 616 (11th Cir. 2004), *citing* Bass v. Bd. of County Comm'rs, Orange County, Fla., 256 F.3d 1095, 1117 (11th Cir. 2001).  Under Title VII's anti-retaliation provision, "an adverse employment action" means either "an ultimate employment decision" or some other decision that meets a "threshold level of substantiality."  Stavropoulos, 361 F.3d at 616, *citing* Bass, 256 F.3d at 1118.  An "ultimate employment decision" would be decisions such as termination, failure to hire, failure to promote, a demotion, or lessening of pay, position, or benefits.  Wideman v. Wal-Mart Stores, Inc., 141 F.3d 1453, 1456 (11th Cir. 1998); *see also* Stavropoulos, 361 F.3d at 616-617.

> In *Wideman*, 141 F.3d at 1455-56, we concluded that the plaintiff had crossed the threshold of substantiality where she established that her employer had improperly listed her as a no-show on a day she was scheduled to have off, gave her written reprimands which resulted in a one-day suspension, solicited comments on her performance from only those employees with negative things to say about her, failed to schedule her for work, threatened to shoot her in the head, and delayed authorizing medical treatment for an allergic reaction she was having.  *Id.* at 1455-56 (holding that the totality of these acts meet the threshold of substantiality, but declining to decide whether anything less than the totality would meet the threshold).

Stavropoulos, 361 F.3d at 617.

Here, Plaintiff's claims of retaliation do not concern an "ultimate employment decision."  Plaintiff's complaint itself fails to present a viable claim of retaliation because Plaintiff has done nothing more than assert that Allan Scott retaliated and "would not allow [Plaintiff] to talk to shop steward."  Doc. 56, p. 5.  That fails under the substantiality test.

Plaintiff also alleged that Tracy Jackson retaliated by ordering him to work on an unsafe machine.  Doc. 56, p. 5.  This allegation fails as an actionable act of retaliation because it is undisputed that all employees were working under the same conditions when operating the machine Plaintiff alleged was unsafe.  Plaintiff was not treated differently than other employees.

Plaintiff alleged that plant manager Jerry Johnson retaliated with verbal threats and told Plaintiff he better not call the police unless he had a bullet in his head.  Doc. 56, p. 5.  This alleged threat also is insufficient to state a claim for retaliation because there was no adverse employment action taken against Plaintiff.  Wideman is distinguished as involving a much greater series of unfavorable actions against the employee.

Plaintiff's allegation of retaliation by Suzanne Moore is similarly unsupported.  Suzanne Moore was his supervisor on September 6, 2003, and allegedly told him on that date "to work two machines at once."  Doc. 56, p. 6.  Apparently this is the alleged retaliatory act.  However, Plaintiff did not file EEO claim 1H-321-0105-03 until November 19, 2003, and he filed EEO claim 1H-321-0022-04 on January 20, 2004.  Docs. 60-40 (ex. M) and 60-41 (ex. NN).  Thus, the alleged retaliation preceded both

EEO claims.  Plaintiff could not have suffered retaliation by Ms. Moore on September 6, 2003, for having filed these charges.

**Conclusion**

For all of these reasons, it is **RECOMMENDED** that Defendant's motion for summary judgment, doc. 60, be **GRANTED**, that Plaintiff's revised motion for partial summary judgment, doc. 70, be **DENIED**, and that the order direct the Clerk of Court to enter judgment in favor of the Defendant on all claims.

**IN CHAMBERS** at Tallahassee, Florida, on January 15, 2008.


**s/     William C. Sherrill, Jr.**
**WILLIAM C. SHERRILL, JR.**
**UNITED STATES MAGISTRATE JUDGE**


<u>**NOTICE TO THE PARTIES**</u>

**A party may file specific, written objections to the proposed findings and recommendations within 15 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 10 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**